## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

MEGHAN S.,

                   Plaintiff,

      v.

KILOLO KIJAKAZI,
Commissioner of Social Security,

                  Defendant.

Case No. 20 C 1592

Magistrate Judge Sunil R. Harjani

## MEMORANDUM OPINION AND ORDER

Meghan S. challenges the ALJ's denial of her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. Because the ALJ's decision is supported by substantial evidence, the Court denies Meghan's request for reversal or remand [16] and grants the Commissioner's motion for summary judgment [21].

## BACKGROUND

Meghan applied for SSI on December 28, 2016, alleging disability due to developmental delay, autism spectrum disorder, attention deficit hyperactivity disorder ("ADHD"), underlying anxiety, and irritability since December 14, 1992, her date of birth. At the hearing, Meghan amended her alleged disability onset date to February 14, 2014. Meghan was diagnosed with developmental delay at age three, autism spectrum disorder in kindergarten, and ADHD and underlying anxiety and irritability at age 21. Meghan received special educational services of speech and occupational therapy through elementary school with a paraprofessional specifically assigned to her and was in a special education setting through middle school. During high school, Meghan had an Individualized Education Plan and an aide was embedded in her class in case she needed help. Meghan was not taking any medications at the time of the hearing, but she had taken

Concerta and Adderall for her ADHD during fourth through sixth grades. Meghan graduated from high school and earned an Associate's Degree in English. At the time of the hearing, Meghan was working on a Bachelor's Degree in English. Meghan testified that she wants to be a writer. Meghan has no past relevant work.

On December 13, 2018, ALJ Deborah M. Giesen issued a decision denying Meghan's application. (R. 18-32). ALJ Giesen found that Meghan's autism spectrum disorder and ADHD were severe impairments, but they do not meet or medically equal the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id*. at 21-23. The ALJ determined that Meghan retained the residual functional capacity to perform a full range of work with no exertional, manipulative, communicative, environmental or postural limitations. As for non-exertional limitations, the ALJ found Meghan had the ability to understand, remember, and carry out simple instructions and deal with changes in a routine work setting with occasional interaction with coworkers and supervisors and no interaction with the general public. *Id*. at 23-24. Based on the VE's testimony, the ALJ found that Meghan is able to perform unskilled jobs that exist in significant numbers in the national economy, namely cleaner, laundry worker, and cleaner polisher. *Id*. at 31. As a result, the ALJ found that Meghan was not disabled since December 28, 2016, the date of her application. *Id*. at 32.

## DISCUSSION

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is disabled, the ALJ conducts a five-step inquiry: (1) whether the claimant is currently

unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals any of the listings found in the regulations, *see* 20 C.F.R. § 404, Subpt. P, App. 1 (2004); (4) whether the claimant is unable to perform her former occupation; and (5) whether the claimant is unable to perform any other available work in light of her age, education, and work experience. 20 C.F.R. § 416.920(a)(4); *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). These steps are to be performed sequentially. 20 C.F.R. § 416.920(a)(4). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Clifford*, 227 F.3d at 868 (quoting *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985)).

Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon a legal error. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (quoting *Consol. Edison Co. v. NLRB*, 305 US 197, 229 (1938)). "Although this standard is generous, it is not entirely uncritical." *Steele*, 290 F.3d at 940. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Id.*

In support of her request for reversal or remand, Meghan argues that the ALJ erred in: (1) assessing whether her autism met or equaled the paragraph B criteria of Listing 12.10; (2) failing to adequately accommodate her non-exertional limitations in her RFC; and (3) weighing the treating mental health opinion evidence. For the reasons discussed below, the Court finds the

ALJ's decision supported by substantial evidence—which is only "more than a mere scintilla." *Biestek*, 139 S.Ct. at 1154.

## A.     Step Three Analysis

Meghan contends that the ALJ underestimated the limitations caused by her autism at step three of the sequential disability analysis.  In particular, Meghan challenges the ALJ's finding that her autism fails to satisfy the paragraph B criteria.  To satisfy the paragraph B criteria, Meghan must show one extreme or two marked limitations in the following areas of mental functioning: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.00(E)1-4, 12.10(B).  Meghan bears the burden of proving that her "impairments meet a listing, and [she] must show that [her] impairments satisfy all of the various criteria specified in the listing." *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2005).  In evaluating the paragraph B criteria, the ALJ found that Meghan had moderate limitations in the first three above categories and mild limitations in the fourth category.[1] (R. 21-23).  Meghan argues that the ALJ should have found that she has marked limitations in the first three categories of the paragraph B criteria, meaning she is "seriously limited" in the ability to function "independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(F)(2)(d).  She also maintains that her deficits in adapting or managing oneself are at the very least, moderate, if not marked.

The Court finds no error at step three.  The ALJ relied on more than a mere scintilla of evidence in finding that Meghan had less than marked limitations in each domain and built an

---

[1]     A person with a moderate limitation has a "fair" ability to function "independently, appropriately, effectively, and on a sustained basis" in a given area. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(F)(2)(c). A mild limitation means that one's "functioning in this area independently, appropriately, effectively, and on a sustained basis is slightly limited." *Id*. at § 12.00(F)(2)(b).

accurate and logical bridge from the evidence to her conclusions in each of the four mental functioning areas. In the area of understanding, remembering, or applying information, Meghan relies on: (1) a February 2014 psycho-educational testing report revealing low scores in working memory capacity, short-term memory, visual-spatial reasoning, and processing speed and (2) a March 2014 neuropsychological examination report showing significant challenges with critical thinking, judgment, visual memory, executive reasoning/novel problem solving tasks, and deficits in memory and applying information, evidenced by difficulty with recall of a list of words and trouble discerning between correct and incorrect items in recognition cueing. (R. 286, 320-22). The ALJ expressly considered the cited reports and findings highlighted by Meghan, but concluded that other evidence in the record suggested that Meghan's limitation in understanding, remembering, or applying information is more moderate than the testing indicates. *Id*. at 21, 25. Specifically, the ALJ correctly noted that Meghan was doing well in her college courses and had maintained good academic standing; she had a driver's license which suggested some ability to understand driving rules even though she does not drive independently; and at the hearing, she showed good memory for detail, particularly regarding her educational history, recalling easily the courses she had taken at school. *Id*. The ALJ noted that psychologist Kelly Johnson, Psy.D., the same psychologist who performed the neuropsychological examination, found that Meghan demonstrated the ability to recall vocabulary words and facts, engage in abstract thinking with areas covered in school or familiar topics, and had strengths in performing in routine environments despite her challenges with critical thinking, judgment, and novel reasoning. *Id*. at 21, 316, 319, 322.

The ALJ also noted that Dr. J.B. Goebel, Ph.D., a consultative clinical and social psychologist who examined Meghan in February 2017, found that Meghan had good memory and

informational knowledge with good abstract thinking regarding proverbs and similarities and differences. *Id*. at 21, 453. Dr. Goebel, whose opinion the ALJ gave "some weight," found that Meghan's understanding and memory were only mildly impaired. *Id*. at 454. Moreover, in her two examinations, psychiatrist Courtney Wiseman, M.D., found Meghan's memory normal. *Id*. at 26, 28, 428, 438. Thus, the ALJ specifically considered the evidence from the psycho-educational and neuropsychological evaluations and chose not to rely on it to the extent it was not consistent with other evidence in the record which suggested Meghan had only moderate difficulties in understanding, remembering, or applying information. The ALJ's weighing of the evidence regarding the first paragraph B criterion was fully explained and is supported by substantial evidence.

Meghan claims the ALJ "glossed over" the fact that she is unable to drive without someone else in the car and neglected to mention how much support and accommodation she has required to complete her college courses, including extra testing time and a low-distraction environment for test-taking. Doc. 16 at 9. Contrary to Meghan's assertions, the ALJ explicitly acknowledged in her step three discussion that Meghan did not drive independently but reasonably found that her driver's license evidenced her ability to understand driving rules. (R. 21). Reading the ALJ's decision as a whole, in her RFC discussion, the ALJ also mentioned that: (1) Meghan testified "she no longer drives"; (2) Meghan's mother reported "she lacks the necessary social ability to go out alone or drive by herself"; and (3) Meghan has a valid driver's license, but "does not drive independently." *Id*. at 24, 25; *Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004 ) ("it is proper to read the ALJ's decision as a whole."). Based on the foregoing, the Court does not find that the ALJ's analysis glossed over the fact that Meghan does not drive alone. Nor did the ALJ ignore the educational support and accommodation Meghan has received, as Meghan maintains. The ALJ

noted in her decision that Meghan required "special accommodations in her education, allowing her extra time to take tests as well as the ability to take tests in a quiet environment with few or no distractions." (R. 22, 29); *see also id*. at 27 ("The record shows that the claimant was able to successfully take academic level courses in high school, ultimately completing her Associate's Degree, and has been able to maintain a regular course schedule while working towards her bachelor's degree, all with some accommodation and resources support."); *id* at 30 (same).

Regarding the second domain of interacting with others, Meghan challenges the ALJ's determination that her limitations in this area were only moderate. The ALJ recognized and adequately discussed the extent of Meghan's difficulties interacting with others. (R. 21-22). In discussing this area of functioning, the ALJ cited the March 2014 neuropsychological evaluation in which Dr. Johnson noted that Meghan has difficulty interacting with others due to an impairment in her use of non-verbal behaviors as well as challenges developing age-level peer relationships appropriate to her developmental level and trouble taking interest in or perceiving what others might be thinking or feeling. *Id*. at 22, 314, 326. The ALJ also cited to Dr. Johnson's finding that Meghan did not pick-up well on social cues and did not camouflage her statements to fit the social setting. *Id*. at 22, 318. The ALJ found important that Dr. Johnson recommended social skills training for Meghan but neither Meghan nor her mother followed up on this recommendation. *Id*. at 22, 63, 78, 328-29. The ALJ further noted that Meghan's mother testified that Meghan: does not follow through on making conversation with others; tends to isolate herself even with family; does not react well to questions about grades, being corrected, or being given direction from her sister, which suggested some difficulty in interacting with supervisors; has problems making eye contact; and has other social difficulties, such as looking away when spoken to, not initiating conversation, and shows no recognition when others are present. *Id*. at 22, 70, 72-73. The ALJ

cited Meghan's testimony that she does not interact much with other students at school. *Id*. at 22, 58, 62-63.

However, the ALJ also identified more than a mere scintilla of evidence which supports her finding that Meghan has no more than moderate limitations in interacting with others.  The ALJ noted that Meghan did not exhibit bizarre, significantly avoidant, inappropriate, or aberrant behaviors in school or in examinations, even with new examiners, despite her problems with social functioning. (R. 22).  For example,  Dr. Goebel indicated that during the consultative mental status evaluation, Meghan was cooperative and had good eye contact. *Id*. at 453.  The ALJ found significant that Dr. Goebel reported that he did not observe any mannerisms consistent with autism and he stated that Meghan was the "highest functioning autistic person [he] had ever evaluated." *Id*. at 453, 454.  Furthermore, the ALJ gave "some weight" to the opinion of Dr. Goebel who found that Meghan was moderately impaired in her social interaction ability. *Id*. at 29, 454.  The ALJ noted that during the hearing, Meghan exhibited no socially inappropriate behavior, appeared cheerful, and answered questions conversationally and fully. *Id*. at 22, 26.  Finally, even Dr. Johnson indicated that Meghan was cooperative, talkative, self-assertive, intelligent, and conversational over the course of five days of testing and evaluation. *Id*. at 22, 318.

Meghan cites to Dr. Johnson's neuropsychological evaluation, which the ALJ expressly considered, and argues that Dr. Johnson's findings are consistent with the assessments of Meghan's treating psychologist (Dr. Kunal Sachdev, Psy.D.) and psychiatrist (Courtney Wiseman, M.D.) in the domain of interacting with others.  It is true that Dr. Sachdev noted that Meghan reported difficulty understanding social cues and building and maintaining social relationships and Dr. Wiseman opined that Meghan's social interaction abilities would be precluded due to her impairments more than fifteen percent of a workday. (R. 377, 418).  As addressed more fully

8

below, the ALJ adequately explained her reasons for giving these opinions "little" and "limited" weight respectively. As noted above, there is conflicting evidence regarding the severity of Meghan's social interaction limitations, and it was therefore within the ALJ's discretion to find that Meghan was no more than moderately limited in interacting with others. *Weber v. Kijakazi*, --- Fed. Appx. ----, 2021 WL 3671235, at *4 (7th Cir. 2021) ("Weighing conflicting evidence is exactly what the ALJ was required to do in assessing [claimant's] disability claim."). Consequently, under the limited scope of review, the Court concludes that the record contains substantial evidence supporting the ALJ's determination that Meghan is not markedly limited in her ability to interact with others.

Meghan next argues that she is at least markedly impaired in her ability to concentrate, persist, and maintain pace ("CPP"). In making this argument, Meghan asserts that the ALJ did not mention that on neuropsychological testing performed by Dr. Johnson, she scored in the tenth percentile in self-pacing and the eighth percentile in commission errors on the vigilance task. (R. 322). But an ALJ "need not mention every piece of evidence, so long as [s]he builds a logical bridge from the evidence to h[er] conclusion." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). Here, the ALJ clearly explained why the evidence supported moderate limitations in CPP. Although the ALJ did not mention the specific testing results identified by Meghan, she extensively addressed the findings of Dr. Johnson's neuropsychological evaluation. The ALJ acknowledged that testing showed Meghan as having attention and concentration "well below expectations," exhibiting challenges arriving at a reasonable pace and having difficulties with working in a timely manner when having to sequence more than three steps, which caused her to become overwhelmed and using a trial and error method. (R. 22, 321-22). As Meghan notes, the ALJ also acknowledged that she had required special accommodations in school, including extra

time on tests as well as taking tests in a quiet environment with few or no distractions. *Id*. at 22. The ALJ noted that testing showed deficiencies in Meghan's memory were partially related to the allocation of attentional resources and she was observed as having difficulty screening out distracting stimuli and comprehending longer reading passages. *Id*. at 22, 321-22.

Nevertheless, the ALJ identified other evidence in the record which suggests that Meghan is no more than moderately limited in CPP. Specifically, the ALJ noted that despite the observed issues with attention, Dr. Johnson found that Meghan "was able to work steadily, responding well to the structured environment and prompts" without "heightened levels of stress." (R. 22, 318). The ALJ noted that Meghan told Dr. Johnson that her attention was only an issue when distraction increases and although her mind wanders when doing homework, she tries to work through it on her own. *Id*. at 23, 318. The ALJ observed that the evidence shows that Meghan engages in "cerebral tasks" such as computer use and reading, including frequently reading large books and having read a wide variety of literature. *Id*. at 22. Furthermore, the ALJ noted that Meghan was able to correctly perform serial sevens and simple math calculations during her consultative examination with Dr. Goebel. *Id*. at 22, 453. Dr. Goebel opined that Meghan had no more than moderate limitations in sustained concentration and persistence. *Id*. at 29, 454. And Dr. Wiseman found Meghan's "attention and concentration grossly normal." *Id*. at 26, 28, 428, 438. The ALJ considered that examiners observed Meghan as generally persisting and persevering with difficult testing tasks and that Meghan testified that when she took a difficult math class, even though she ended up having to retake it, she did not drop it during the semester due to its difficulty. *Id*. at 22. Finally, the ALJ cited Meghan's good academic history, which shows that Meghan was able to successfully complete academic level courses in high school, ultimately earning an Associate's Degree, and has been able to maintain a regular course schedule while working towards her

Bachelor's Degree. *Id*. at 23. Although Meghan disagrees with the ALJ's interpretation of the CPP evidence, the ALJ's interpretation was not unreasonable and she did not fail to consider any relevant line of evidence. Where reasonable minds could differ, the Court must defer to the ALJ's conclusion. *Vrooman v. Kijakazi*, --- Fed. Appx. ----, 2021 WL 3086196, at *2 (7th Cir. 2021). The ALJ's finding that Meghan is no more than moderately limited in concentrating, persisting, or maintaining pace is thus supported by substantial evidence.

Finally, Meghan challenges the ALJ's failure to find no more than mild limitations in her capacity to adapt or manage herself. In making a determination regarding this domain, the ALJ recognized Meghan's difficulties adapting and managing herself, but relied on her ability to learn routines and take care of her own self-care and household chores with some support from her mother. (R. 23). The evidence the ALJ cited indicated that Meghan takes out the garbage, unloads the dishwasher, vacuums, cleans her room, prepares simple meals, maintains a regular schedule of three or four classes each semester, exercises regularly, completes homework, and manages her time "depending on how busy she is with her homework." *Id*. at 23, 315, 317. Meghan also exhibited appropriate dress and grooming when she appeared for examinations. *Id*. at 23. In addition, the ALJ expressly acknowledged Dr. Wiseman's observation that it is difficult to assess the extent of Meghan's ability to act independently given the amount of support her mother provides. Contrary to Meghan's claims, this is sufficient evidence to support the ALJ's conclusion that Meghan is only mildly limited in the functional area of adapting or managing oneself.

In addition, the ALJ's decision relied on the state agency reviewing psychologists' conclusions. (R. 29). Two state agency psychologists, Leslie Fyans, Ph.D. and Joseph Mehr, Ph.D., opined that Meghan did not meet a listing because she had only mild limitations in the areas of understanding, remembering, or applying information and adapting or managing oneself and

moderate difficulties in the areas of interacting with others and concentrating, persisting, or maintaining pace. *Id*. at 95, 107. In making these findings, the state agency psychologists considered the evidence from Dr. Johnson and Dr. Goebel as well as the findings of the February 2014 psycho-educational testing. *Id*. at 94, 106. On reconsideration, Dr. Mehr also specifically considered Dr. Sachdev's opinions in reaching his conclusions. *Id*. at 106. The ALJ gave "significant weight" to these opinions. *Id*. at 29. While the ALJ did not expressly refer to the reviewing psychologists' opinion in her step three analysis, the Court reads the ALJ's decision as a whole, and Drs. Fyans' and Mehr's opinions constitute substantial evidence supporting the ALJ's Listing 12.10 determination. *Masaglia v. Saul*, 805 F. App'x 406, 409-10 (7th Cir. 2020) ("Opinions of state-agency consultants may constitute substantial evidence on the issue of whether a claimant's impairments meet a presumptive disability listing."); *Rice*, 384 F.3d at 370 n.5; *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004).

In the end, Meghan's step three argument is merely a disagreement with the way in which the ALJ weighed the evidence rather than a showing that the ALJ's findings are not supported by substantial evidence. Because the Court cannot reweigh the evidence, the ALJ's step three determination is affirmed. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019).

**B.    Mental RFC Assessment**

Meghan also challenges the ALJ's mental RFC assessment. "The RFC is an assessment of what work-related activities the claimant can perform despite her limitations." *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). "An ALJ has 'final responsibility' for determining a claimant's residual functional capacity and need not adopt any one doctor's opinions." *Fanta v. Saul*, 848 F. App'x 655, 658 (7th Cir. 2021); 20 C.F.R. § 416.927(d)(2).

As an initial matter, Meghan argues that the ALJ erred in assessing her RFC by doing "nothing more than repeat[ing] her Step 3 analysis." Doc. 16 at 12-13. Meghan points out that at step three and when formulating her RFC, the ALJ relied on the same evidence concerning her valid driver's license, her good academic record with the support of accommodations, her ability to perform in routine and structured environments, her appropriate social behavior at examinations and the hearing, the consultative examiner's observation that she is high functioning, and Meghan's daily activities with some support from her mother. It is true, as Meghan notes, that the RFC assessment requires a more detailed assessment of the paragraph B criteria. But it is not surprising that the ALJ relied largely on the same evidence and rationales in her step three and RFC findings as those inquiries often overlap. *See Jeske v. Saul*, 955 F.3d 583, 590 (7th Cir. 2020) ("when an ALJ explains how the evidence reveals a claimant's functional capacity, that discussion may doubly explain how the evidence shows the claimant's impairment is not presumptively disabling under the pertinent listing."); *Thomas K. v. Saul*, 2020 WL 6566228, at *4 (N.D. Ill. Nov. 9, 2020) (the fact that the ALJ provided a "thorough summary and discussion of [the] evidence in h[er] step 3 section and did not *repeat* it in his RFC section does not detract from h[er] reasoning."). Moreover, the ALJ adequately explained how her paragraph B findings factored into her mental RFC assessment. (R. 27). After thoroughly reviewing the evidence, the ALJ included several mental restrictions in her RFC assessment. The ALJ accounted for Meghan's moderate social limitations by limiting her to occasional interaction with coworkers and supervisors and no interaction with the public. *Id*. at 27. By limiting Meghan to understanding, remembering, and carrying out simple instructions and finding that she could deal with changes in a routine work setting, the ALJ accounted for her moderate and mild limitations in the remaining three paragraph

B criteria. *Id*. at 27. The Court therefore rejects Meghan's assertion that the ALJ failed to provide a more detailed analysis of her autism and ADHD in her RFC assessment.

The Court also rejects Meghan's argument that the RFC is flawed because it did not adequately account for her specific limitations in concentration, attention, memory, and interacting with other people. The RFC assessment "must incorporate a claimant's limitations, including moderate CPP limitations." *Bruno v. Saul*, 817 F. App'x 238, 242 (7th Cir. 2020). A "restriction to simple tasks is 'generally' not enough to account for moderate CPP limitations." *Id.*; *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019). But "[t]here is no categorical rule that an ALJ may never accommodate 'moderate' limitations in concentration, persistence, and pace with only a restriction to simple tasks." *Weber*, --- Fed. Appx. ----, 2021 WL 3671235, at *5. The Seventh Circuit has accepted "an ALJ's hypothetical [and corresponding RFC] omitting the terms 'concentration, persistence, and pace' when it [is] manifest that the ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to perform." *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010). Moreover, the Seventh Circuit has held that "an ALJ may reasonably rely upon the opinion of a medical expert who translates [CCP] findings into an RFC determination." *Burmester*, 920 F.3d at 511.

The ALJ determined that Meghan has moderate limitations in CPP, understanding, remembering, or applying information, and interacting with others and mild limitations in adapting and managing herself. To accommodate these restrictions, the RFC finding limited Meghan to understanding, remembering, and carrying out simple instructions, dealing with changes in a routine work setting, occasional interaction with coworkers and supervisors, and no interaction with the public. The ALJ adequately explained why she believed the evidence indicated that those restrictions accounted for Meghan's non-exertional limitations. In discussing the functional

14

domains other than interacting with others, the ALJ noted that according to the psychological examinations, Meghan displayed some limitations with memory, attention, and adapting to changes, but that she also showed average capabilities and the ability to follow simple tasks and routines. (R. 30). The ALJ further found that Meghan was capable of performing simple tasks and dealing with changes in a routine setting given her activities of daily living and her own subjective statements regarding her ability to perform chores, self-care, and school-related activities. *Id*. The ALJ explained: "Accordingly, [Meghan's] average performance on mental evaluations, along with her ability to maintain classes and other activities of daily living that require concentration, attention, memory, and independence, suggest that [she] is capable of understanding, remembering, and carrying out simple instructions, and dealing with changes in a routine work setting." *Id*. at 27.

Moreover, in discussing Meghan's social interaction abilities, the ALJ noted that Meghan's limitations were largely related to her ability to make friends and interact appropriately with others, but that the record did not indicate a pattern of significant aberrant behaviors or any bizarre, inappropriate, or significantly avoidant behaviors in examinations, at school, or at the hearing. (R. 26, 27). Additionally, the ALJ noted no effort had been made to obtain social skills training for Meghan or other help in developing or maintaining skills to be more independent even though such training had been recommended by medical sources. *Id*. at 27. The ALJ explained, however, that she credited the portion of Meghan's and her mother's testimony regarding her social abilities and limited Meghan to no interaction with the public. *Id*. at 27, 30.

The ALJ's RFC determination adequately accounted for Meghan's mental impairments and is supported by substantial evidence. In determining Meghan's mental RFC, the ALJ gave significant weight to the opinions of the state agency psychologists who found moderate

limitations in CPP and interacting with others and mild limitations in understanding, remembering, or applying information and adapting or managing oneself yet concluded that Meghan could perform simple, routine, unskilled work. *Id*. at 29, 30. Dr. Fyans and Dr. Mehr provided a narrative discussion explaining that Meghan's impairments may inhibit her ability to respond appropriately to the general public and to supervisor criticism as well as carry out detailed instructions and extended concentration but that she is capable of carrying out routine chores and tasks. *Id*. at 98, 111. Dr. Fyans opined that Meghan should be in a socially restricted environment and that her adaptive, interpersonal, cognitive, and attentional skills and resources are capable of performing one and two-step unskilled steps. *Id*. at 98. Dr. Mehr found that Meghan had the cognitive and attentional skills for three to four step tasks. *Id*. at 111. Both state agency psychologists found that despite her autism and ADHD and moderate CPP limitations, Meghan could sustain simple, routine, unskilled tasks "across a workday and a work week." *Id*. at 98, 111. The ALJ found both state agency psychological assessments consistent with the record as a whole. *Id*. at 29.

When fashioning the mental RFC, the ALJ further noted that during the February 2017 consultative exam, Dr. Goebel opined that Meghan was high functioning, showing good recall of digits forward and backward, ability to recall three out of three objects after five minutes, good orientation, memory, and recall, ability to perform simple math equations and serial sevens successfully, good abstract thinking and judgment and insight, ability to describe similarities and differences between two objects, and demonstrating no perceptual disturbance. (R. 26, 29). The RFC assessment is largely consistent with Dr. Goebel's findings that Meghan is moderately limited in areas relating to sustained concentration and persistence, social interaction, and adaption and mildly impaired in understanding and memory. *Id*. at 30, 454. In addition, the ALJ limited Meghan to a routine work setting based on her ability to manage schoolwork, chores, exercise, and pastimes

according to a routine schedule as well as Dr. Johnson's finding that Meghan performs best in routine environments. *Id*. at 21, 23, 25-27, 29, 319, 322. Finally, the ALJ noted that Dr. Wiseman's mental status exams revealed that Meghan's memory was within normal limits and her attention and concentration appeared grossly normal, with no impulsivity. *Id*. at 26, 28, 428, 438.

In sum, the ALJ explained the bases for her conclusions, tying the RFC to the evidence in the record. The mental limitations the ALJ included are substantially supported by the state agency psychologists' opinions, which themselves are largely consistent with the consultative opinion of Dr. Goebel. The ALJ reasonably relied on Dr. Fyans (affirmed by Dr. Mehr) to translate Meghan's mental impairments into an RFC. *Pavlicek v. Saul*, 994 F.3d 777, 784 (7th Cir. 2021) (ALJ's reliance on state agency consultants' opinions to account for limitation in maintaining CPP was permissible) *Morrison v. Saul*, 806 F. App'x 469, 474 (7th Cir. 2020) (relying on the opinion of a medical expert is a "permissible way of 'translating' medical evidence into work-related restrictions."). *Dudley v. Berryhill*, 773 F. App'x 838, 843 (7th Cir. 2019). The ALJ's RFC limiting Meghan to understanding, remembering, and carrying out simple instructions, dealing with changes in a routine work setting, and occasional interaction with coworkers and supervisors with no interaction with the general public accommodated Meghan's autism and ADHD issues by restricting her from detailed instructions which require extended concentration, restricting her from adapting to non-routine tasks, limiting her interaction with coworkers and supervisors, and eliminating interaction with the public. *Id*. at 98, 111. Thus, the RFC excluded tasks that someone with Meghan's demonstrated issues could not perform. *See Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019) (noting the Seventh Circuit will uphold even "generic[ ]" limitations so long as they "adequately account for the claimant's demonstrated psychological symptoms" found in the record).

Meghan faults the ALJ for not including an RFC restriction requiring "considerable support and supervision to remain on task." Doc. 16 at 14. However, the ALJ addressed this line of evidence, and more than a mere scintilla of evidence supports her failure to include an additional support and supervision limitation in the RFC. The ALJ noted that Meghan was "able to sustain her coursework without constant support and supervision, not having one-on-one direct assistance during classes, except for math tutoring." (R. 28). The ALJ also noted that while the record indicates significant support from Meghan's mother, as Dr. Wiseman observed, this made it difficult to understand the extent of Meghan's ability to act independently. *Id.* at 29, 30. The ALJ acknowledged that Drs. Johnson and Wiseman opined that Meghan would be unable to perform work on a sustained, consistent, useful and routine basis without continuous supervision, but as explained below, the ALJ did not err in affording limited weight to these opinions. *Id.* at 28, 416-17, 448, 450. As noted above, the ALJ gave significant weight the opinions of the state agency psychologists. Both state agency psychologists found that Meghan was "not significantly limited" in her "ability to sustain an ordinary routine without special supervision." *Id.* at 97, 110. The ALJ gave less weight to the part of Dr. Mehr's narrative assessment based on Meghan's mother's statements and Dr. Sachdev's statement that in her daily activities, Meghan needs reminders to carry out tasks, external structure to function, and support to regain focus during times of demand. *Id.* at 29, 111, 377. The ALJ clearly rejected this evidence suggesting further support and supervision limitations because of substantial evidence to the contrary, including Meghan's independence in her self-care and completing homework and household chores, Meghan's ability to independently complete tasks on mental status exams, Dr. Fyans's opinion, and Dr. Goebel's opinion. *Id.* at 26, 27, 29, 30. The ALJ satisfied her duty by pointing to sufficient evidence that was contrary to an additional support and supervision limitation and explaining the restrictions

Meghan had as a result of her limitations. Thus, the ALJ did not error in failing to include additional support and supervision restrictions in the RFC.

Other than additional support and supervision, Meghan does not suggest further restrictions supported by the record which she believes should have been included in the RFC. Without proposing additional restrictions which are warranted by the record, Meghan's remaining attack on the ALJ's mental RFC fails. *Morrison*, 806 F. App'x at 474; *Kuykendoll v. Saul*, 801 F. App'x 433, 438 (7th Cir. 2020); *Jozefyk*, 923 F.3d at 498 (finding any error in the RFC assessment harmless because plaintiff hypothesized no additional work restrictions that might address his CPP limitations).

Finally, the Court rejects Meghan's argument that the evidence the ALJ cited is not indicative of an ability to sustain full-time work. The record indicates that the ALJ relied on the opinions of the state agency psychologists and the consultative examiner, the results of the psycho-educational assessment, neuropsychological evaluation, Meghan's allegations, the statements of Meghan's mother, and Meghan's school schedule, academic performance and daily activities as evidence that she could sustain full-time work. (R. 24-30). Moreover, the ALJ gave "significant weight" to the opinions of the state agency psychological consultants who specifically opined that despite Meghan's mental impairments, she is able to perform full-time, unskilled work, which is simple and routine with social limitations. *Id*. at 98, 111 (noting Meghan "can sustain this across a workday and a work week").

## C.    **Medical Opinion Evidence**

Meghan argues that in determining her RFC, the ALJ should have given more weight to the opinions of her three treating mental health professionals, Dr. Sachdev, Dr. Johnson, and Dr. Wiseman. She also faults the ALJ for overweighing the opinions of the consulting examining

psychologist (Dr. Goebel) and two state agency psychologists (Drs. Fyans and Mehr). The ALJ assigned "little" weight to Sachdev's opinion, "limited" weight to Dr. Johnson's and Dr. Wiseman's opinions, "some" weight to Dr. Goebel's opinion, and "significant" weight to the opinions of the state agency psychologists Dr. Fyans and Dr. Mehr. (R. 27-29). The ALJ adequately articulated why she gave each opinion the weight she did and her reasons are supported by more than a mere scintilla of evidence. As a result, the Court finds not error in the ALJ's consideration of the opinion evidence.

The opinion of a treating source is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 416.927(c)(2) (governing claims filed before March 27, 2017). An ALJ must "offer good reasons for giving a treating physician's opinion less than controlling weight." *Fair v. Saul*, 2021 WL 17, at *21 (7th Cir. 2021) (internal quotes omitted). "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); 20 C.F.R. § 416.927(c). "[I]f the treating physician's opinion is inconsistent with the consulting physician's opinion, internally inconsistent, or based solely on the patient's subjective complaints, the ALJ may discount it." *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008).

Meghan challenges the ALJ's decision to afford only "little weight" to Dr. Sachdev's August 2017 opinion that Meghan has difficulty understanding social cues and building and maintaining social relationships, has trouble focusing on tasks, needs reminders to carry out tasks

and external structure to function during the day, and is easily overwhelmed and needs support to regain focus and work through the task at hand. (R. 27, 377). In discounting Dr. Sachdev's opinion, the ALJ noted that Dr. Sachdev based his opinion on Meghan's "reported history" and three visits (April 6, 2017, April 19, 2017, and June 15, 2017) at which "[n]o formal assessment tools were used." *Id*. The ALJ explained that she found Dr. Sachdev's opinion regarding Meghan's limited social relationships and difficulty keeping on task during exams somewhat consistent with the record. *Id*. at 27. The ALJ found, however, that the remainder of Dr. Sachdev's opinion was inconsistent with Meghan's demonstrated ability to perform tasks such as household chores and schoolwork without significant trouble. *Id*. The reasons provided by the ALJ are good reasons for deciding to give only little weight to Dr. Sachdev's opinion. *See* 20 C.F.R. § 416.927(c)(2)-(4) (treating physician opinion evaluated based on nature and length of treatment relationship, supportability, and consistency); *also Karr v. Saul*, 989 F.3d 508, 512 (7th Cir. 2021) ("[A]n ALJ does not owe any deference to the portion of a treating physician's opinion based solely on the claimant's subjective complaints."); *Winsted v. Berryhill*, 923 F.3d 472, 478 (7th Cir. 2019) ("an ALJ may discredit the opinion if it is inconsistent with the record.") (internal citation omitted).

The ALJ also provided good reasons for discrediting Dr. Johnson's opinion regarding Meghan's mental limitations. On July 12, 2018, Dr. Johnson completed a mental RFC statement. (R. 446-51). According to Dr. Johnson, Meghan's autism disorder precludes her from understanding and remembering both simple and detailed instructions, carrying out detailed instructions, and maintaining extended attention and concentration for more than 15 percent of an eight-hour workday. *Id*. at 448. Dr. Johnson found similar limitations in Meghan's ability to interact with supervisors, coworkers, and the general public and her ability to adapt to changes in her environment. *Id*. at 449. Dr. Johnson wrote that Meghan needs "heavy direction" to sustain an

ordinary routine. *Id*. at 448. Finally, Dr. Johnson opined that Meghan's impairments would result in her being off task more than 30 percent of a workday and that Meghan would be able to perform a job on a sustained, consistent, useful and routine basis without continuous supervision or undue interruptions and distractions about 20 percent of the time. *Id*. at 450.

The ALJ recognized that there was some support for Dr. Johnson's opinion regarding Meghan's memory and attention in that testing indicated that her attention and concentration were "well below expectations." (R. 28). But the ALJ explained that she afforded Dr. Johnson's mental RFC opinion limited weight because: (1) it was partially based on input from Meghan and her mother rather than on Dr. Johnson's objective observations of Meghan; (2) it was inconsistent with Meghan's average performance in other testing; (3) it was not entirely consistent with Dr. Johnson's treatment notes from 2018 which indicated Meghan does well with structure and framework and recommended she take driving lessons and practice, which would require greater capabilities than Dr. Johnson's opinion suggest; (4) it was not consistent with other evidence in the record which showed Meghan completed an Associate's Degree and much of the coursework for a Bachelor's Degree with some support and managed her daily activities; (5) it was not consistent with Meghan being able to sustain her coursework without constant support and supervision and not having one-on-one direct assistance during classes except for math tutoring; (6) there was no evidence in the record showing significant abnormal social behaviors during exams or in school; and (7) Dr. Johnson observed that Meghan was engaged, cooperative, talkative, self-assertive, intelligent, and conversational. *Id.* The ALJ reasonably discounted Dr. Johnson's mental RFC opinion where it was inconsistent with her own notes and other evidence in the record and relied on Meghan's and her mother's subjective reports. *See Pavlick*, 994 F.3d at 781 ("An ALJ may decline to give a treating physician's opinion controlling weight when the

opinion is inconsistent with the physician's treatment notes."); *Karr*, 989 F.3d at 512; *Richison v. Astrue*, 462 F. App'x 622, 625 (7th Cir. 2012) ("The ALJ did not err here in determining that [the treating physician's] opinion conflicted with other medical evidence, including his own treatment notes.").

The ALJ likewise offered good reasons for affording Dr. Wiseman's opinions limited weight. On August 21, 2018, Dr. Wiseman completed a mental RFC assessment form and opined that Meghan's impairments would preclude performance of almost all areas of sustained concentration and memory and social interaction for 15 percent or more of an 8-hour workday and that she could perform a full-time job without continuous supervision or undue interruptions or distractions for 20 percent of the time. (R. 416-18). The ALJ correctly pointed out that Dr. Wiseman met Meghan only three times and performed only two mental status exams. *Id*. at 28. The ALJ noted that Dr. Wiseman's opinion was inconsistent with her own notes which indicated that Meghan: (1) reported no trouble with details, directions, or chores and performance of some independent tasks and (2) had normal attention, concentration, and memory exhibited on mental status examinations. *Id*. at 28, 427-28, 438. Moreover, the ALJ assigned limited weight to Wiseman's opinion because it was not consistent with other evidence in the record, including Meghan's college record, everyday activities like computer usage, and her ability to maintain chores and complete simple, routine tasks. *Id*. at 29. The ALJ further noted that Dr. Wiseman referred generally to testing results and "information from Dr. Kelly Johnson" as support for her opinion but she provided no specific supporting citation and merely attached Dr. Johnson's mental RFC assessment. *Id*. at 28-29. In addition, the ALJ noted Dr. Wiseman's observation that Meghan's mother's support makes it difficult to understand the full extent of Meghan's ability to act independently. *Id*. at 29, 438. Substantial evidence supports the ALJ's discrediting of Dr.

23

Wiseman's opinion, namely the limited treatment relationship and the contrast between Dr. Wiseman's mental RFC statement and her own treatment records and the overall record. *See* 20 C.F.R. § 416.927(c)(2)-(4); *Pavlicek*, 994 F.3d at 781; *Winsted*, 923 F.3d at 478.

Meghan's only specific challenge to the ALJ's consideration of the opinions of her treating mental health providers is that the ALJ did not discuss the "nature or extent" of Meghan's treatment relationships with those providers. Doc. 16 at 15. As discussed above, the ALJ specifically noted that Meghan met with Drs. Sachdev and Wiseman just three times each. (R. 27) ("Dr. Sachdev bases his opinion on three visits."); *id.* at 28 ("Dr. Wiseman supports her assessment on three visits with [Meghan]."). Moreover, the ALJ thoroughly discussed the neuropsychological evaluation and testing performed by Dr. Johnson on five occasions in February and March 2014 and cited to Dr. Johnson's treatment notes dated April 14, 2017, January 1, 2018, March 6, 2018, and May 8, 2018, and July 12, 2018. *Id.* at 21- 25, 28; *see also id.* at 29 (ALJ noting that Dr. Johnson had "a greater treatment relationship" with Meghan than Dr. Goebel). The ALJ's consideration of Dr. Johnson's neuropsychological evaluation and many of Dr. Johnson's treatment records which together spanned several years shows that she adequately considered the nature and extent of Meghan's relationship with Dr. Johnson. *Candice A. Z. v. Kijakazi*, 2021 WL 3187783, at *5 (N.D. Ill. July 28, 2021).

The ALJ gave psychological consultative examiner Dr. Goebel's opinion some weight. (R. 29). After evaluating Meghan, Dr. Goebel found that Meghan was "the highest functioning autistic persons [he had] ever evaluated"; mildly limited in understanding and memory; and moderately limited in social interaction, sustained concentration and persistence, and adaptation. *Id.* at 454. The ALJ reasonably believed that these findings were entitled to some weight in view of the overall record. She accepted Dr. Goebel's conclusion that Meghan was moderately limited in social

interaction and concentration and persistence but found her more limited in understanding and memory and less restricted in adaptation than Dr. Goebel assessed. *Id*. at 21-23.  The ALJ noted that Dr. Goebel's opinion was inconsistent with medical source statements from Dr. Wiseman and Dr. Johnson who had greater treating relationships with Meghan and Dr. Johnson's testing which showed Meghan with greater deficits in memory and concentration, but the ALJ found that Dr. Goebel's opinion was consistent with his own observations of Meghan as high functioning with good academic standing and her own reported ability to do chores like emptying garbage bins and the dishwasher, setting the table, vacuuming, dusting, cleaning her bathroom, caring for the cat, folding laundry, and sometimes cooking. *Id*. at 29, 453.  The ALJ noted that Dr. Goebel's mental capacity evaluation, in which Meghan performed well in testing of her memory and concentration, also supported his opinion. *Id*. at 29, 453-54.  The ALJ reasoned that Dr. Goebel's opinion was largely consistent with other evidence in the record including Meghan's school schedule, academic achievements, and her daily activities. *Id*. at 29.  For these reasons and because Meghan does not identify any specific error with the weight the ALJ gave to Dr. Goebel's opinion, the ALJ supported her decision to give the consultative examiner opinion partial weight with substantial evidence.

Meghan also claims the ALJ erred regarding the significant weight she gave to the state agency psychologists.  Based on psycho-educational testing in February 2014, Dr. Johnson's testing in February and March 2014, Dr. Goebel's March 2017 opinion, information from Meghan's mother, and Dr. Sachdev's opinion (on reconsideration), Dr. Fyans and Dr. Mehr found that Meghan would have moderate and mild limitations in a work setting but could perform unskilled work involving simple, routine tasks with limited steps and limited social interaction with supervisors and the public. (R. 94, 98, 106-07, 111).  The ALJ found these assessments well

25

supported by and consistent with Meghan's treatment records and other observations of Meghan, including noted difficulties in her ability to concentrate and maintain pace and her social interactions but otherwise general average performance in several areas of testing, Dr. Wiseman's findings that Meghan's attention and concentration were normal, Meghan's academic achievements, and her ability to perform some daily activities independently. *Id*. at 29; 20 C.F.R. § 416.927(c)(3)-(4). As the ALJ noted, the state agency psychologists differed slightly on one point—Dr. Frays believed Meghan was capable of doing one and two-step unskilled tasks while Dr. Mehr believed Meghan was capable of three to four step tasks. *Id*. 29, 98, 111. The ALJ gave "slightly less weight" to Dr. Mehr's opinion that Meghan has the ability to carry out multistep tasks. *Id*. at 29. Meghan complains that the ALJ did not explain the basis for giving less weight to this aspect of Dr. Mehr's opinion, even though the ALJ's finding was more favorable to Meghan. Meghan's argument ignores that earlier in her decision, the ALJ specifically referenced the results of Dr. Johnson's testing which showed that Meghan exhibited difficulties working in a timely manner when having to do more than three steps which cause her to become overwhelmed and using a trial and error method. *Id*. at 22, 25, 321. The ALJ's decision to slightly discount Dr. Mehr's opinion that Meghan could perform multistep tasks is thus supported by substantial evidence in the record.

## CONCLUSION

For the reasons stated above, Plaintiff's request for reversal or remand [16] is denied, the Commissioner's Motion for Summary Judgment [21] is granted, and the ALJ's decision is affirmed. The Clerk is directed to enter judgment in favor of the Commissioner and against Plaintiff.

**SO ORDERED.**

Dated:  September 13, 2021

Sunil R. Harjani
United States Magistrate Judge